UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| TERI L. ARMENTA,<br><br>           Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social<br>Security,<br><br>           Defendant. | No. EDCV10-1578 VBK<br><br>MEMORANDUM OPINION<br>AND ORDER<br><br>(Social Security Case) |

    This matter is before the Court for review of the decision by the Commissioner of Social Security denying Plaintiff's application for disability benefits. Pursuant to 28 U.S.C. §636(c), the parties have consented that the case may be handled by the Magistrate Judge. The action arises under 42 U.S.C. §405(g), which authorizes the Court to enter judgment upon the pleadings and transcript of the Administrative Record ("AR") before the Commissioner. The parties have filed the Joint Stipulation ("JS"), and the Commissioner has filed the certified AR.

    Plaintiff raises the following issues:

    1.    Whether the Administrative Law Judge ("ALJ") could rely on

```
                  the testimony of the vocational expert as "substantial
                  evidence;
       2.   Whether the ALJ properly considered the medical evidence of
            limitations on Plaintiff's ability to use her hands.
(JS at 4; 13.)
```

This Memorandum Opinion will constitute the Court's findings of fact and conclusions of law. After reviewing the matter, the Court concludes that for the reasons set forth, the decision of the Commissioner must be reversed and the matter remanded.


**I**

**<u>THE ALJ PROPERLY RELIED ON THE TESTIMONY OF THE VOCATIONAL EXPERT</u>**

In Plaintiff's first issue, she argues that the ALJ could not properly rely upon the vocational expert's ("VE") testimony, which conflicted with the job definitions set forth in the Dictionary of Occupational Titles ("DOT"), because the deviation between Plaintiff's residual functional capacity ("RFC") and the DOT job descriptions were not explained by the VE. For the reasons to be set forth, the Court disagrees with Plaintiff's analysis and her contention.

The ALJ determined that Plaintiff has the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c), except for no more than occasional fine and gross manipulations bilaterally. (AR 19.) Plaintiff does not dispute the correctness of this RFC assessment. At the administrative hearing (AR 20-43), testimony was taken from the VE. The ALJ posed hypotheticals which included a limitation to "no more than occasional fine or gross manipulation." (AR 40.) In response, the VE opined that Plaintiff could return to her prior work

as a receptionist. The following discussion then ensued between the ALJ and the VE:

> "Q  Would such an individual be able to perform the past work that you've identified?
>
> A  I believe the work of receptionist could be done.
>
> Q  <u>Even with the manipulation limitations?</u>
>
> A  Well, in looking at that because they [sic] would be some fine or gross, but on the other hand you're often using a headset and you're on the phone talking for a good portion of the day rather than doing any real keying, although there's some ancillary duties that are done. It would reduce the number of receptionist jobs from the total number in the region or the United States, but there would be some that could be done. I would eliminate the customer service due to the amount of data entry in that one, and I think the same would go for the loan officer. Waitress, I think would eliminate waitress. That would be, I'm sure there's a lot of walking around and most of the time they have something in their hand either coming to or from a table. Probably receptionist to a limited basis would be the only one that could be done."

(AR 40-41, emphasis added.)

The physical demands set forth in the DOT for the job of receptionist include occasional fingering with frequent handling. (See DOT 237.367-038.) The DOT does not specifically state that most receptionists use headsets and require only occasional or little use of their hands. Plaintiff asserts that the ALJ erred in failing to

1 elicit from the VE testimony that established whether or not the job
2 of receptionist as Plaintiff could perform it, considering her RFC,
3 deviated from the definition set forth in the DOT.

### A. **Applicable Law**.

Johnson v. Shalala, 60 F.3d 1428 (9th Cir. 1995) is a useful starting point. In Johnson, the ALJ directed the VE to assume that the claimant was restricted to sedentary work and had a number of non-exertional limitations. In response, the VE testified that the individual could not perform her former job but could work in certain identified jobs classified as "light" work, considered a more strenuous category than "sedentary." Plaintiff asserted that there was error because the ALJ had asked the VE to assume that she was limited to sedentary work. (Id. at 1431, fn. 1.) Citing Terry v. Sullivan, 903 F.2d 1273, 1277 (9th Cir. 1990), the Court indicated that, "Terry supports the proposition that although the DOT raises a presumption as to the job classification, it is rebuttable." (Id. at 1435.) The Court thus held that the ALJ may rely upon expert testimony which contradicts the DOT "but only insofar as the record contains persuasive evidence to support the deviation." (Id.) The Court found there was such persuasive testimony in the record, including evidence of available job categories in the local rather than the national market, and testimony matching the requirements of a designated occupation with the specific abilities and limitations of the claimant. (Id.) The Court noted that "in this case, the ALJ's explanation is satisfactory because the ALJ made findings of fact that supported deviation from the DOT." (Id., fn. 7.)

The Court also noted that the DOT is not the only source of

4

1 admissible information concerning jobs. The Commissioner can take
2 administrative notice of any reliable job information including the
3 testimony of a VE. (Id. at 1435, citing Barker v. Shalala, 40 F.3d
4 789, 795 (6th Cir. 1994), Whitehouse v. Sullivan, 949 F.2d 1005, 1007
5 (8th Cir. 1991).)
6    In Massachi v. Astrue, 486 F.3d 1149 (9th Cir. 2007), the Circuit,
7 perhaps acknowledging the possible ambiguity in the above portion of
8 the Johnson opinion, noted the following:
9       "For the first time, we address the question whether,
10      in light of the requirements of SSR 00-4p, an ALJ may rely
11      on a vocational expert's testimony regarding the
12      requirements of a particular job without first inquiring
13      whether the testimony conflicts with the Dictionary of
14      Occupational Titles. We hold than an ALJ may not."
15 (46 F.3d at 1152.)

17    In Massachi, the Court noted that Johnson had been decided prior
18 to the enactment of SSR 00-4p, but that nevertheless, Johnson had
19 instructed that an ALJ could rely upon expert testimony contradicting
20 the DOT only under circumstances in which persuasive evidence to
21 support the deviation had been demonstrated. (See Massachi, 486 F.3d
22 at 1153.) But, as Massachi made clear, SSR 00-4p provides unambiguous
23 guidance which requires the adjudicator to discharge an affirmative
24 responsibility to resolve conflict between a VE's testimony and
25 information provided in the DOT. (Id. at 1152.) As Massachi noted,
26 these procedural requirements "ensure that the record is clear as to
27 why an ALJ relied on a vocational expert's testimony, particularly in
28 cases where the expert's testimony conflicts with the [DOT]." (Id. at

5

1153.)

It is clear to this Court that *Massachi* clarified any possible ambiguity in *Johnson*, by requiring strict adherence to the requirements of SSR -04p. Thus, if there is a deviation, there must exist persuasive evidence in the record itself, which may be evidenced by the ALJ inquiring into the VE's reasons for identifying jobs in which there is a deviation between a claimant's exertional abilities, as set forth in the hypothetical question, and the jobs actually identified.

**B.   *Analysis*.**

Plaintiff's position would, effectively, require a completely literal interpretation to be applied to the Ninth Circuit's opinions in *Johnson* and *Massachi*. That is, it would require that an ALJ specifically use language to the effect of, "Is there a deviation between the physical limitations set forth in the hypothetical question I have posed to you and the job requirements set forth in the DOT, concerning the job which you have identified?" The Court does not believe that such exact language must be used to satisfy the required parameters of the inquiry. The issue is whether the deviation was explained. In this case, the ALJ's question, "Even with the manipulation limitations,?" (AR 40) is functionally equivalent to an inquiry as to whether or not there was a deviation, and if so, explain it. The VE's answer to that question focused on limitations in Plaintiff's RFC to occasional fine or gross manipulation, and indicated that the job of receptionist as it is usually performed is done using a handset "for a good portion of the day rather than doing any real keying, ... [which] would reduce the number of receptionist

1  jobs from the total number in the region or the United States, but
2  there would be some that could be done." (AR 40-41.)
3       It is clear from the above interchange that the ALJ was
4  specifically inquiring into a deviation between Plaintiff's RFC and
5  the DOT's identification of exertional requirements of the identified
6  job.  The VE responded in kind by identifying specific reasons why,
7  even with her physical limitations, Plaintiff could perform this
8  particular job.  In the JS, Plaintiff poses the question as whether
9  the ALJ solicited sufficient explanation to allow for the deviation
10 from the DOT. (JS at 7.)  While Plaintiff believes the answer is no,
11 the Court respectfully disagrees. There does not need to be literal
12 language in the interchange between an ALJ and a VE which uses the
13 word "conflict," "deviation," or similar words in order to satisfy the
14 requirement that the deviation or conflict, if any, be explained.
15 Here, there is no doubt that the ALJ effectively did inquire into the
16 deviation, and the VE responded specifically by indicating why
17 Plaintiff could still do the job, even with that deviation.  Had this
18 discussion between the ALJ and the VE not occurred, Plaintiff's
19 argument would have carried substantial weight.  But looking at the
20 actual facts in this case, the Court cannot find that the record
21 substantiates Plaintiff's argument, and accordingly, the Court cannot
22 find error as to the first issue.

**II**

**THE ALJ PROPERLY EVALUATED THE OBJECTIVE MEDICAL OPINIONS,**
**BUT NOT PLAINTIFF'S SUBJECTIVE TESTIMONY REGARDING PHYSICAL**
**LIMITATIONS ON USE OF HER EXTREMITIES**

28      Plaintiff's second issue is twofold.  First, she asserts that the

7

ALJ did not correctly assess testimony of her treating physicians regarding the extent of limitations in use of her hands, in particular, finger manipulation and dexterity. (JS at 13-17.)  In a separate analysis, Plaintiff asserts that the ALJ improperly rejected her credibility regarding her subjective descriptions of her physical abilities and pain. (JS at 17-20.)

For the reasons to be set forth, the Court disagrees with Plaintiff's first contention, but agrees with the second.

**A.  Objective Evidence**.

As the Court has already noted, the ALJ assessed that her RFC precludes Plaintiff from more than occasional fine and gross manipulations bilaterally. (AR 19.)  In making this assessment, the ALJ reviewed the opinions of various physicians, including workers' compensation physicians and a consulting board-certified orthopedic surgeon. (AR at 16-18.)

The Court will briefly summarize the ALJ's review of these opinions, as set forth in the decision.  Regarding Dr. Brourman (see AR at 211-315), the ALJ noted that this physician precluded heavy work, repetitive work, and activities requiring finger dexterity. (AR 219.)

Plaintiff received workers' compensation Agreed Medical Examination ("AME") from Dr. Eugene Harris on March 14, 2005. (AR 316-323.)  Dr. Harris indicated precluded Plaintiff from prolonged repetitive fine motion of the right wrist and hand, power grasp or torque with either hand, heavy lifting with either wrist or hand, and that the only reasonable approach to return to the work environment might be consideration of a voice-operated computer system. (AR 322.)

1    Dr. Swan, a State Agency physician, assessed that Plaintiff could
2 perform the physical demands of medium work, but would have
3 limitations in the areas of handling (gross manipulation) and
4 fingering (fine manipulation). (AR 342.)
5    Dr. Conaty performed a consultative orthopedic examination on
6 August 6, 2007 at the request of the Department of Social Services.
7 (AR 333-337.) Dr. Conaty limited Plaintiff to occasional gross and
8 fine manipulation. (AR 337.)
9    The ALJ gave greatest weight to the assessments of Dr. Conaty,
10 stating that they were based on "his detailed, objective findings,
11 ..." (AR 17.)
12    Plaintiff complains that the ALJ completely ignored the opinion
13 of Dr. Harris, and that of Dr. Brourman, but the Court agrees with the
14 Commissioner's contention that Dr. Harris' conclusion was not
15 inconsistent with that of the RFC finding of the ALJ. The functional
16 limitations assessed by Dr. Harris do not conflict with those of the
17 ALJ. If Plaintiff is referencing Dr. Harris' opinion that a
18 "reasonable approach to return to the work environment might be
19 consideration of a voice-operated computer system," the Court does not
20 perceive this to be an opinion addressed to Plaintiff's physical
21 capacity. Dr. Harris is not a vocational expert, and his opinion in
22 this regard should be entitled to very little weight, if any. It is
23 Dr. Harris' functional assessments as to Plaintiff's physical capacity
24 which are relevant, and in that regard, the Court agrees that there is
25 no significant distinction, if there is any, between the ALJ's
26 assessment, and that of Dr. Harris.
27    The same can be said of Dr. Brourman's conclusions; that is, they
28 do not really conflict in a substantial way with those of the ALJ.

Indeed, the ALJ's decision noted Dr. Brourman's conclusion that Plaintiff is precluded from heavy or repetitive work or work requiring finger dexterity. (AR 16, citing 219.) Dr. Brourman specifically indicated that Plaintiff has lost approximately 66% or two-thirds pre-injury capacity for performing finger dexterity activities. (Id.) These restrictions were articulated by Dr. Brourman in a workers' compensation context, but they were considered by the ALJ, and the Court does not perceive that there is a material distinction between Dr. Brourman's assessment that Plaintiff has lost two-thirds pre-injury capacity for performing finger dexterity activities, and the ALJ's restriction to no more than occasional fine and gross manipulations bilaterally.

**B.  Credibility Findings.**

The second part of Plaintiff's issue concerns the ALJ's evaluation of her credibility concerning subjective pain complaints. The ALJ determined that Plaintiff "would not experience severe or disabling pain or any other disabling symptoms." (AR 17.) This is followed by his recital of five evaluative factors which come within the parameters of Social Security Ruling ("SSR") 96-7p. (AR 17-18.)

Plaintiff asserts that there is no evidence of malingering. (JS at 18, citing Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). The Commissioner argues that in fact, there is evidence of malingering, and references the ALJ's analysis of the opinion of Dr. Harris, a workers' compensation physician, who "cited the claimant's exaggeration of her symptoms, as evidenced by reporting "overwhelming" complaints of pain and related functional limitations not supported by objective,

clinical findings." (AR 16, citing AR 322.) But the Court does not read Dr. Harris' opinion as supporting a conclusion of malingering, or even an exaggeration of subjective complaints. A fair reading of Dr. Harris' opinion should include the previous paragraph of his report, in which he noted that "the general impression of [Plaintiff] is that she is appropriate and believable." (AR 321.) Even the following paragraph, which although noting subjective complaints that are "somewhat overwhelming," contains no discussion that would lead one to conclude that Dr. Harris believed that Plaintiff was exaggerating or malingering.

Certainly, the longitudinal medical record in this case indicates that for years, Plaintiff has been in pain in both of her upper extremities. A review of the Disability Reports is consistent. In one, she stated that,

> "I am in constant pain. My hands are very weak. I am not able to sleep the pain weak [sic] me up. I am not able to write or even comb my daughter's hair." (AR 147.)

In another report, she indicated the following:

> "I have become very frustrated not being able to do the things I used to do. I can't care for my daughter, doing her hair, washing, ironing etc. I can't use a computer. I can write approximately two checks to pay bills at a time, then I have to stop to rest my arms. I have difficulties driving and usually have to depend on others to make me places. My arms swell from my hands to my elbow, and the pain extends all the way to my shoulders." (AR 160.)

Plaintiff's testimony regarding her subjective pain was consistent with both her written reports and the consensus of various physicians who examined her over the years. As to her functional abilities, she indicated she could hold a cup of coffee with both hands, but she has dropped them. She has some problems writing, but she can fill out a check. If she does too much writing the pain gets unbearable and she drops the pen. She does some cooking, but her husband does the chopping and cutting, or her mother comes over to help her. She can not lift pans. If she does, she may drop them. Pain shoots up her arm and her hand will literally fall asleep. She takes Motrin, which sometimes helps if she needs to drive. She wears braces on her elbows, mostly at night. She does very little laundry, mostly little loads, and again, her mother will come over to help. She can do a little bit of dishwashing. She can empty the lower level of the dishwasher. With regard to her own grooming, she can not keep her arms elevated for an amount of time so she mostly just pulls her hair back. She loses strength if she keeps her arms elevated. (AR 27-32.)

With this review of Plaintiff's subjective complaints in mind, the Court can now examine the ALJ's stated reasons for depreciating Plaintiff's credibility. He first indicated that no treating or examining physician has ever opined that she is totally and permanently disabled due to physical impairments. (AR 17.) But the ALJ appears to be conflating the issue of disability with that of subjective pain. A claimant can have credible subjective pain complaints and still not be disabled. The issue is whether subjective pain impacts a claimant's functional abilities. Consequently, the first cited reason is essentially irrelevant.

The ALJ next cited the opinion of Dr. Conaty with regard to Plaintiff's ability to perform occasional gross and fine manipulations. Again, the question is not one of objective medical evidence, but of credibility. In any event, Dr. Conaty's opinion that Plaintiff could perform occasional gross and fine manipulations, which the ALJ adopted in formulating an RFC assessment, is no different, essentially, than Plaintiff's own description of her abilities. For example, when Plaintiff said that she could lift a coffee cup with both hands, but might drop it, that is certainly not inconsistent with a finding that she can only do occasional gross and fine manipulations. Thus, the second reason set forth in the decision has no applicability to the credibility determination.

The ALJ's third reason makes reference to a comparison between Plaintiff's pain complaints and her ability to do such things as writing, laundry, and the like, which are typically referred to as activities of daily living (ADL). (AR 18.) The ALJ also observed that there is no evidence of muscle atrophy in either of her hands or arms. While this may be the case, there is also no question that Plaintiff has experienced carpal tunnel syndrome and that she underwent a right-sided de Quervain's release on January 4, 2005 (performed by Dr. Brourman) (AR 246-247), following a right carpal tunnel release on December 2, 2003, which was also performed by the same physician. (AR 272-273.) Indeed, not a single physician whose opinions are contained in this record has opined that Plaintiff does not suffer from these conditions, and indeed, one physician, Dr. Harris, remarked that because the surgical procedures performed on Plaintiff's right extremities had apparently not been successful in ameliorating her pain, he would not recommend that she undergo a similar procedure on

her left side.  Although Dr. Brourman maintained that Plaintiff's symptoms on her left side could be cured with surgical intervention, he also noted that the insurance company had cut off her care. (See Dr. Brourman's report of April 10, 2006, at AR 218.)

The fourth stated reason, that there is no evidence that Plaintiff is using strong narcotic pain relievers, but only Motrin as of August 2007, is simply not borne out by the record, and indeed, the ALJ acknowledged in the same breath that Plaintiff testified she is also using Darvocet for pain relief. (AR 18.)  Further, the ALJ apparently gave no credence to Plaintiff's testimony that she has side effects from medications ("I have a weak tummy.  At best, the Darvocet does make me tired so I only take that when it's at night time because -- ... the Motrin will upset my stomach if I don't eat so that's the only thing."). (AR 26-27.)  In any event, there is no indication that stronger medications have been prescribed by any physician, or that Plaintiff is not compliant with the recommendations of her doctors. Thus, the Court discounts the fourth stated reason.

Finally, the ALJ depreciated Plaintiff's credibility because she has not undergone any upper extremity surgery since January 4, 2005. (AR 16.)  Plaintiff has stated to her physicians that she is hesitant to undergo left-side surgery because of the lack of success of the surgery on her right side.  As Dr. Harris observed, these surgeries have been "distinctly unsuccessful," and he remarked that Plaintiff's declination to undergo surgery on her left extremities "is appropriate, considering the patient's response to the surgery on the right wrist and hand." (AR 321.)  None of this discussion, however, was addressed by the ALJ, who simply criticized Plaintiff for not having further surgeries after 2005.

14

The Court finds that none of the credibility factor reasons stated in this administrative decision can be upheld.  Thus, there is no question that this matter must be remanded for further hearing, and that Plaintiff's subjective pain complaints must be evaluated de novo. None of the reasons stated in the decision will be relied upon when this matter is reheard, nor will an inference be drawn that Plaintiff is malingering or exaggerating her symptoms, as the existing records do not support such a conclusion.

For the foregoing reasons, this matter will be remanded for further hearing consistent with this Memorandum Opinion.

**IT IS SO ORDERED**.

DATED: August 22, 2011               /s/
                                VICTOR B. KENTON
                                UNITED STATES MAGISTRATE JUDGE